Good morning, Your Honors. May it please the Court, my name is Andrew Wyatt, and I represent the appellant. I would like to reserve four minutes for rebuttal, please. You'll have to help us keep track, and we don't use it all with questions. The issues presented today that we're appealing on is, number one, was it appropriate for the district court to grant summary judgment in the case. The second issue was that a plaintiff had presented 250 undisputed facts that were never, ever rebutted by the defendant, and the lower court failed to consider those facts that were favorable. The applicable law in this case, Your Honors, first off, for purposes of summary judgment, is the case of Celotex Corp. v. Catrick, which is cited at 477 U.S. 317. And in that case, the Supreme Court indicates that when a court is looking at summary judgment, they should view the facts most favorable in light of a nonmoving party. And only if then, if there is no material issue of genuine fact, then at that point, you know, summary judgment is appropriate. Roberts, to put it simply, if on the fact the material facts is a rational jury confined in his favor, they don't grant summary judgment. Piano. Piano. Correct, Your Honors. And certainly, I think in this case, there were a lot of issues that were raised to the court that certainly would create an inference that a trier of fact would have to decide. Whether Mr. Cole would ultimately prevail at trial, that's not even the issue. The fact is that there's certainly enough issues that are in dispute that were material issues that Mr. Cole should have the opportunity to go on to trial. We have provided in our brief, there's a lot of examples of this, and I won't take up the Court's time. I will bring up a few things, though. One of the things I'd like to point out to the Court is that the lower court failed to address the case of Costa v. Desert Palace, cited at 123 Supreme Court, 2148, and that is a 2003 case. In that case, the Court indicates that with discrimination cases, you can have what's called a mixed motive, which means there could be legitimate reasons and non-legitimate reasons that can still infer discrimination. Look, why don't you come to what the – if there's a stumbling block in your way, I suppose it would be something like this. At the end of the day, if there's a decision maker in this case, or there are decision makers, the decision makers would be the three psychiatrists and DeWitt, and I think there's no indication that any of those people had any discriminatory motives. If I'm wrong about that, and the evidence shows that they were discriminating somehow, then illuminate. Okay. Well, for one thing, Mr. Cole is known for his letter writing. His what? His letter writing. In other words, one of the reasons that elevated this – and let me point out, Your Honors, that this case has actually got two parts to it. One is religious discrimination, which involves Mr. Donato, his immediate supervisor, including a comment that all you Jews do is whine. And there are other things that an honest – Let's assume Donato's not a nice man. Okay? Let's just assume that that's not a nice man. Right. Let's assume that the supervisor is not a nice man. Okay. Well, the other part of it, Your Honors, is the retaliation, because there was a settlement in a claim against Donato that happened in December of 2000. It was right after that, six days later, that this whole thing involving the fitness for duty that occurred. So it was a retaliation claim. Timing can get you beyond the prima facie case. That's easy. Maybe that's easy. But anyway, that's a pretty good argument. Timing gets you beyond the prima facie case. But why don't we, again, get to the heart of this thing? We've got three psychiatrists who independently – or was it four, finally? Maybe four people who independently review his situation, including one that he picked. And then we have DeWitt making the final determination based on that. And – Okay. First off, what the three psychiatrists agreed on is that he showed personality traits, obsessive-compulsive personality traits. However, only one of that indicated that he thought that there was a violent tendency. I'm sorry. That was Lustig. Lustig was the first one. He was the one who said that there was violent – that was never substantiated by either of the other psychiatrists. But they all suggested that he shouldn't be returned to that particular position, was my reading of those reports. Well, you know, again – Dr. Packier, is that – Packier. Packier. Yes. That was his own physician, suggested that he should not be returned to that position. Well, okay. What Packier was saying is that there obviously was conflict between Cole and his immediate supervisor, Donato, and being in that particular postal post office could be problematic. However, if you look at all the facts, the fact is that Mr. Cole worked the night shift, and most of his time was spent on an off-site premise. So he had very little time that he actually spent at that facility. And also, if you look at his history, I mean, he was with the Postal Service for 27 years, I believe it was. And the first 24 years, there was not a single problem. And even then, when this all was happening, he still was doing an excellent job with his work. But there were several – there were two, I think, other proposed fitness-for- duty exams requested prior to this third one that actually went forward. So it seems like there at least had been some questions or issues that arose. Well, again, this is – this is surrounding the letter writing. This was – you know, part of what our allegation is that the fitness-for-duty, since there's no procedures to it, it's basically used to flush out people they don't like. And we've indicated that probably seven of the nine that were done – I'm running out of time – were involving EEO complaints. So if they went through legitimate channels, they'd have to have due process. Here, there's no due process. All they do is get a doctor to sign off on that he's unfit, and boom, he's gone. There's not even an appeal process. So the fact that he has certain personality traits, if they probably get a survey of all the people at the Postal Service, they'd probably find a lot of people have that same – probably including his supervisors. But there was no basis, really, for terminating. And they didn't explore any other way of doing this. I mean, they didn't try to find another position. They didn't – You're saying if you're terminated by the Post Office, there's no internal governmental process to question your termination? Is that what you're saying? The only – what he had to do is he had to go through the Merit Board, but there was a discriminatory – It doesn't sound like a process to me. Well, that's after the fact. I'm saying – Excuse me? During the termination process, there was no procedure to protect him to have any type – like if he was – it was a union grievance, they can have their step grievances going on to an arbitration. In this case, through a fitness for duty, there's absolutely no procedural safeguards in place that would enable him to – to protect himself. So I see I have two minutes and 15 seconds. I'd like to reserve the rest of that time for rebuttal. You may do so. Thank you. Well, you're from the Postal Service. Good morning, Your Honors. I'm Assistant United States Attorney David Pincus, and I represent the Defendant Postmaster General. Could you speak a little more loudly, please? Excuse me, Your Honor. I represent the Postmaster General of the United States. I'd like to ask you some questions about the retaliation claim. The – there were some previous requests for a fitness for duty evaluation, but nothing came of them. They were requests that never apparently, from what we have, were followed up on. The only one that was followed up on was the one that came just a few days after the resolution of an EEO complaint. So timing certainly would permit an inference of connection under our case law. And in view of the timing and the fact that one of the letters to the physician mentioned that the person being referred had filed grievances, why isn't that enough to establish the possibility that there was a retaliatory motive in sending this person to be evaluated, which in itself is, you know, potentially a chilling act? Well, Your Honor, first of all, with respect to the doctor's note, Dr. Randall was not a decision-maker. He was a gatekeeper. No, but the letter to him suggests that somebody who was potentially a decision-maker who was referring him, referring the plaintiff to him, was quite aware that there was a grievance, and that's stated to be one of the reasons that he's being sent over. Why isn't the timing plus that letter plus the fact that for 25-plus years, this same person with whatever his quirks were had worked successfully, why isn't that constellation of facts enough to suggest that retaliation could have been one of the motives when we're looking at summary judgment? Well, Your Honor, the issue here is not the grievances that Mr. Cole had filed, but the manner in which he expressed them. There's a point at which even EEO activity becomes so disruptive or disturbing, the way it's expressed, that it loses its protective character, and I think that's what took place here. But why isn't that a question for the jury when what you have is obvious timing, and what you're now arguing is, well, yes, of course he's being, we're going after him for his EEO activity, but his activity was done in such a way that it was disturbing and beyond the pale. But why isn't that a jury question? Well, Your Honor, the testimony that's uncontroverted is that Mr. Cole's behavior was such that it was frightening his coworkers. What did the Postal Service do? It simply asked for a medical evaluation. That was the responsible thing to do. If there hadn't been any problem, the matter would have ended there. But there was a problem. Three different psychiatrists independently diagnosed Mr. Cole with having severe paranoid and obsessive personality disorders. You said that the first two requests weren't followed up on. The testimony of Erica Perino is in the record. It was even cited by Mr. Cole. And she testified that she realized that her earlier requests had not been acted upon, and she decided not to pursue it because she was afraid. And this is her testimony. Mr. Cole, if he was actually separated because of these fitness for duty issues, that he might come with a shotgun and kill people. That's an excellent jury argument. But why can't the opposite argument be made, that nothing was done until a successful EEO complaint was brought, successful in the sense that it resulted in a settlement and the supervisor had been stung for his behavior. And only after that EEO complaint did the Postal Service decide, well, he's been here 27 years and he's always been a little weird, but now that we have this EEO complaint, we're going to see what we can find out about his behavior. Why isn't that an equally permissible argument? I'm not saying that you would necessarily lose. I guess I just have difficulty seeing on this record why there isn't an issue for trial. I don't think this Court has ever held that mere timing alone would create the inference of retaliation. There has to be more. And in this case, the testimony was that Janet Cade, she's simply the EEO representative I mean, the management representative. She was having an unrelated discussion with Mr. Cole in a photocopy room. She happened to be in the post office at the same time. And he was bouncing off the walls. He was acting in a manic manner. He was talking about things that had happened many years ago as if they had just happened today. People discussing incidents about people that had long since gone. And she was disturbed by his behavior. It wasn't, you know, just because there's a tangential connection with his having once-filed agreements, the issue here is the manner in which he's acting. And it's – I understand that sometimes it's difficult to separate it, but on the other hand, Title VII can't be used as a shield to disrupt the workplace. If an employer has a reason to take an action like this, seeking – simply seeking a medical evaluation of an employee, it can't be intimidated by threats of litigation and allegations of retaliation. Like any employer, the Postal Service has a responsibility to maintain a safe environment for all its employees. It was a responsible thing to do. That's all they did was ask for an evaluation. And if there hadn't been anything to it, the matter would have ended. Everything in the record indicates that Mr. Cole was someone who had serious boundary issues. There's evidence of argumentative behavior, complaints of fear of him by five different postal employees. Mr. Cole had tried to drag some of the postal customers into his workplace disputes, and they complained. There were threats by Mr. Cole of taking people out. There were constant threats of litigation against coworkers, managers, and even one of the psychiatrists was threatened with litigation by Mr. Cole prior to the evaluation. There was obsessive rumination about disputes involving persons long gone, manic and compulsive actions, threatening body language, attempts at intimidation, erratic attempts to tie his conspiracy theories involving FBI investigations, and long-stale allegations of court disruption that had nothing to do with his work relationships. And yet you see in all the letters, he brings it up constantly, things that happened 20 years before. It may not have anything to do with his work. Can I just ask a question about Dr. Randall? Yes, ma'am. You had mentioned he was a gatekeeper for these FFDEs going forward. Yes. There have been two prior ones. And what would normally be the reason why those didn't go forward? Is that a decision made? On what sort of grounds is the decision made not to go forward with those? Well, Dr. Randall testified that in many cases he simply looks at it from a medical point of view, as he did here, and decides that there isn't enough to refer this to an outside physician. In each of the cases, the medical unit approved the fitness for duty request, but for some reason it wasn't referred out. What does that mean? That means that these prior two requests went to Dr. Randall, whoever was in that position, and they had approved going forward with it, and then what was the decision point where they didn't go forward? I think it just fell through the cracks was what the testimony was. However, Erica Perino, who was the manager who made the prior fitness for duty request, and by the way, she testified that she wasn't even aware of any prior EO activity by Mr. Cole when she made those requests. She testified that at one point she realized that the fitness for duty hadn't been referred out, and she just made a conscious decision not to make an issue out of it. But the reason was that she was afraid that Mr. Cole might be violent. So this third one was referred out. Yes. And we have the cover letter from Dr. Randall saying that seems to indicate, as Judge Graber noted, that at least part of the motivation was because of EO activity, grievances, and the like. Now, is that the reason? I mean, why wouldn't we infer that that was the reason this one didn't fall through the cracks? Well, first of all, there had been these prior requests, and so they had been approved, so it's unlikely that this would have had anything to do with retaliation. But again, three points. Dr. Randall's not the decision maker. He's not a manager. He, and if you look at his letter, I mean, I think this one sentence is being taken out of context, because this, what is this letter? This is a transmittal letter. It's, he's transmitting a stack of documents, including statements by Mr. Cole, statements by his coworkers. What it says to me in context is, this person is making complaints about management. People are making complaints about him. Help us sort it out. Tell us, is there a problem here? That's really all that it is. But again, simply because a disrupted behavior arises in a connection with a protected activity, that doesn't make it protected. And a supervisor and a manager have to have some sort of discretion to refer these types of cases for fitness for duty and not to be intimidated by it. Thank you, counsel. You have exceeded your time, and I think we understand your position. Thank you, Your Honor. And I believe Mr. Wyatt has a little bit of rebuttal time remaining. I'll try to speak quickly, Your Honors. First off, regarding the prior fitness for duty, that was back in 1997. And although the court didn't address it, in our undisputed facts, it indicated that it was following another EEO complaint that Mr. Cole made. So it was actually in conjunction with another EEO complaint. The current fitness for duty didn't have any new documentation. It actually took the 1997 fitness for duty with the old, going back like four or five years, documentation, and all Ms. Cave did was just put a transmittal cover on it. So there was no new information. Excuse me. I thought there were two. There was a 97 and a 98. Well, the 98, I don't believe, had any new documentation. I didn't see through discovery anything about the 98. I think that that was still the 97, but it just was reissued in 98. There was nothing separate from that. Quickly put, if assuming, just assuming for the moment, that Dr. Russell had a discriminatory motive when he forwarded it to the psychiatrist, but the psychiatrist did an independent, separate examination. They talked to the guy. They had him in. They tested. They did their own examination and made their own recommendation, and then Dewitt, based upon their recommendations, decides to terminate him. No indication here that there are rubber stamps for the person who had a bad motive. Your actions against the Postal Department for terminating him, why shouldn't you? Why doesn't that just break it, the fact that they're not a rubber stamp, and these people are not part of the termination decision? You bring up a good point, Your Honor. The second evaluation was by Dr. Packier, and he wouldn't go all the way to where they wanted, in other words, saying, I think this employee should be terminated. Dr. Randall sent letters to Dr. Packier trying to get him to basically indicate that he should not return to work, and all he was saying is, yes, he has these traits, and it wouldn't be a good idea to go back to where he is, but I can't say, I can't go all the way and say that this is unfit for duty. So what happened was they didn't like that. So instead of just accepting that, they went ahead and hired Dr. Perlow. Now, Dr. Perlow, we provide documentation to show that he has history with Dr. Farid, Abraham Farid, who is the head of the medical unit over at the Postal Service. And Dr. Farid wrote apparently a foreword for Dr. Perlow. Let's skip the you're a nasty man because somebody wrote a foreword. But the thing to point out, Your Honors, is that Dr. Perlow didn't even look at any documentation when he made his assessment. He didn't look at anything. So, yes, there's rubber stamp. Dr. Perlow was involved in at least four other fitness for duties. And, you know, when we questioned, we looked, did anybody ever pass this fitness for duty and actually go back to work? And the answer is no. It's a one-way street out the door. So as far as him frightening coworkers, our undisputed facts indicate we have a lot of employees, including the two that were supposedly anonymous people that submitted to the letter saying that Mr. Cole was not confrontative. They did not get into altercations. In fact, they ate his bean dip. They didn't fear him. And even Ms. Kalora liked him, including also Mr. Nelson, his supervisor. I mean, so if they're saying that he's a menace and that, it's just simply the record does not reflect that. Thank you, counsel. Your time has expired. Thank you, Your Honors. The case just argued is submitted.
judges: Fernandez, Graber, Ikuta